IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


TEXARKANA BEHAVIORAL
ASSOCIATES, L.C.                                              PLAINTIFFS


V.                            CASE NO. 08-CV-4031


UNIVERSAL HEALTH SERVICES, INC.                    DEFENDANT


## MEMORANDUM OPINION

Before the Court is Defendant Universal Health Services, Inc.'s ("UHS") Renewed Motion

for Summary Judgment.  (Doc. 106).  Following the filing of UHS's initial Motion for Summary

Judgment (Doc. 52), Plaintiff Texarkana Behavioral Associates, L.C. ("TBA") moved to amend its

complaint.  (Doc. 82).  Over UHS's opposition, the Court granted the motion to amend (Doc. 87),

and TBA filed an Amended Complaint.  (Doc.89).  Because the complaint had changed, the Court

denied without prejudice UHS's initial Motion for Summary Judgment.  (Doc. 90).  UHS renewed

its motion for summary judgment.  (Doc. 106).  TBA responded. (Doc. 112).  UHS filed a reply.

(Doc. 115). TBA filed a sur-reply.  (Doc. 131).  The Court finds the matter ripe for consideration.

## BACKGROUND

UHS, a nationwide healthcare management company, owns and operates, among other things,

behavioral health centers.  Two of its behavioral health care facilities are located in Arkansas: an

acute psychiatric facility in North Little Rock called the BridgeWay and an acute inpatient residential

treatment center in Benton known as Rivendell.  UHS has recently opened a new behavioral health

facility, Springwoods, which is located in Fayetteville.  TBA, operating under the trade name Vista

Health, also runs behavioral health facilities.  TBA has two acute inpatient behavioral health facilities in Arkansas: one in Fayetteville and another in Fort Smith.

In 2000, UHS unsuccessfully bid on a bankrupt healthcare facility in Fayetteville that was ultimately purchased by TBA and became its Fayetteville facility.  UHS remained interested in the Northwest Arkansas market.  In July 2004, UHS and TBA discussed the possibility of UHS purchasing TBA. In order to evaluate the potential purchase, UHS required sensitive business information from TBA.  The parties therefore entered into a confidentiality agreement (the "2004 Agreement") that sought to allow UHS access to the information while protecting TBA's interests.

The 2004 Agreement provides that UHS, as the "Prospective Purchaser," wishes to review "Asset Material" belonging to TBA "for the purpose of determining whether or not to purchase all of the assets and certain liabilities of [TBA]."  The 2004 Agreement further states that "Asset Material," also defined to be "Confidential Information," is being disclosed to UHS "solely for the purpose of allowing [UHS] to . . . determine whether [UHS] is willing to submit an offer to purchase the Assets."  The 2004 Agreement does not commit UHS to make an offer, prohibit UHS from constructing a facility in Northwest Arkansas, or address future competition between the parties.

Following consummation of the 2004 Agreement, TBA shared sensitive information about its business with UHS.  The parties disagree as to whether TBA furnished UHS with all of the information that it requested, and as to the reason why the negotiations broke down.  The Court finds these disputes to be immaterial because the important point is clear: the negotiations did not lead to a purchase agreement in 2004.  The parties briefly rekindled negotiations in 2005, but they likewise did not lead to a purchase agreement.

In November 2006, UHS bought property in Fayetteville on which to build a behavioral hospital.  UHS informed TBA of its intention to build a facility in Fayetteville.  Shortly thereafter,

TBA inquired as to whether UHS was interested in its Fayetteville facility.  In order to assess the potential acquisition, UHS required updated business information.  The parties entered into a second confidentiality agreement (the "2007 Agreement"), which the parties agree is virtually identical to the 2004 Agreement.  Following consummation of the 2007 Agreement, TBA again shared sensitive business information with UHS.  Again the negotiations broke down without a purchase agreement being reached.  TBA contends that UHS never intended to make an offer and entered the agreements only to see TBA's information.  UHS contends that TBA withdrew from the negotiations and never responded to UHS's offer to provide an offer. In the email ending negotiations, TBA requested that UHS return or destroy the information that was shared pursuant to the 2007 Agreement.

After the negotiations ended, UHS moved forward with it plans to build a behavioral facility in Fayetteville.[1]  UHS's Fayetteville facility, Springwoods, opened in late 2009 and began full operations in early 2010.  The facility is in competition with TBA's Fayetteville facility.

In 2008, TBA filed this lawsuit in federal court based on diversity jurisdiction,[2] alleging that UHS misappropriated TBA's trade secrets, breached the confidentiality agreements, and interfered with TBA's contractual relationships and business expectancies.  TBA sought injunctive relief preventing UHS from, *inter alia*, constructing its Springwoods facility.  TBA amended its complaint to add a claim for damages/unjust enrichment, "misuse of confidential information," and violation

---

[1] TBA contends that the parties entered an oral "standstill agreement" whereby UHS agreed not to move forward on construction of its facility while purchase talks with TBA were ongoing.  TBA contends that it ended purchase discussions in part because it heard rumors that UHS was continuing to move forward with construction of its facility.  Because the alleged oral standstill agreement was not incorporated into the 2007 Agreement, the Court addresses these allegations in the discussion of the Deceptive Trade Practices Act claim rather than the contract claim.

[2] Because the case is before the Court on diversity jurisdiction, Arkansas substantive law applies.

3

of the Arkansas Deceptive Trade Practices Act.  The Amended Complaint asserts three "counts": (1) "Misuse of Confidential, Proprietary Information and Misappropriation of Trade Secrets"; (2) "Breach of Contract"; and (3) "Interference with Contractual Relationships or Business Expectancies—Prospective Advantages; Violation of Deceptive Trade Practices Act."  In response to the Amended Complaint, UHS renews its motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

FED. R. CIV. P. 56(c) states that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Under this standard, the inquiry is not on whether the evidence favors one side or the other, but "whether a fair minded jury could return a verdict for the plaintiff on the evidence presented."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  When considering a summary judgment motion, the Court "must view the evidence 'in the light most favorable to the nonmoving party.'"  *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 445 (8th Cir. 2008).  To defeat a motion for summary judgment, however, the non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The "nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial."  *F.D.I.C. v. Bell*, 106 F.3d 258 (8th Cir. 1997).  "In order to survive a motion for summary judgment, the non-moving party must be able to show sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Binkley v. Entergy Operations, Inc.*, 602 F.3d 928, 931 (8th Cir. 2010).

4

**DISCUSSION**

The central issue in this case is whether TBA has presented sufficient evidence from which to conclude that UHS has improperly used the confidential materials it received during the aborted purchase attempts.  Although it is fairly clear that UHS possessed confidential materials, it is less clear what use UHS made of those materials.  TBA has presented no direct evidence of UHS's improper use.  Rather, TBA contends that it is permissible to infer that UHS improperly used the confidential materials from the fact that UHS possessed the materials, the materials could have been useful in deciding to invest in a new facility, designing the facility, and structuring its operations, and UHS in fact constructed and now operates a competing facility in the Fayetteville area.  TBA further contends that UHS had no intent to purchase TBA, and that the entire purchase negotiations were simply a ruse to view the confidential information.  UHS contends that TBA's suspicions are insufficient to raise issues of material fact in the face of sworn statements from UHS officials that the materials were not used improperly and that UHS intended to make an offer. Because the dispute centers on what inferences may reasonably be drawn from the evidence rather than competing versions of the events,[3] the Court finds the matter amenable to resolution on summary judgment.

### Count 1–"Misuse of Confidential, Proprietary Information and Misappropriation of Trade Secrets"

TBA seeks to hold UHS liable for misappropriating TBA's trade secrets. The Court notes that the Arkansas Trade Secrets Act ("the Act"), ARK. CODE ANN. § 4-75-601 et seq., is TBA's exclusive remedy for UHS's alleged misappropriation of TBA's trade secrets.  The Act specifically

---

[3] As noted in the background discussion, the parties differ on some particulars.  For instance, they dispute who bears the fault for the break down of the 2004-2005 purchase discussions.  The Court finds the disputes for which there is competing evidence to be immaterial, and thus insufficient reason to deny summary judgment. *See* FED. R. CIV. P. 56(c).

"displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret," although it does not affect "[c]ontractual or other civil liability or relief that is not based upon misappropriation of a trade secret." ARK. CODE ANN. § 4-75-602. Accordingly, to the degree TBA seeks to recover under different tort causes of action for the same conduct alleged in its misappropriation of trade secrets claim, those claims are preempted. TBA's exclusive remedy for improper use of the information, outside of the exempted contract claim, is pursuant to the Arkansas Trade Secrets Act. *See R.K. Enter., LLC v. Pro-Comp Mgmt., Inc.*, 356 Ark. 565, 574, 158 S.W.3d 685, 690 (2004).

> The Act defines a "trade secret" as follows:
>
> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process that:
>
> (A) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can readily obtain economic value from its disclosure or use; and
>
> (B) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

ARK. CODE ANN. § 4-75-601(4). In addition to the statutory definition, Arkansas courts rely on six factors to determine whether information is a trade secret: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and its competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could properly be acquired by others. *See Saforo & Assoc., Inc. v. Porocel Corp.*, 337 Ark. 553, 559, 991 S.W.2d 117, 120 (1999) (citing *Vigoro Industries, Inc. v. Cleveland Chemical Co. of Arkansas, Inc.*, 866 F. Supp. 1150 (E.D. Ark.1994)).

TBA contends the information it provided to UHS qualifies as trade secrets.  Specifically, in its opposition to the Renewed Motion for Summary Judgment, TBA mentions: a detailed balance sheet; a detailed aging accounts receivable by payor and patient mix, broken down cost reports, lease contracts, employee pay rates, managed care contracts, and long term operating strategies.  TBA avers that this information is valuable to organizing a mental health care business and not generally known by people outside of TBA.  Also, TBA avers that it has undertaken reasonable efforts to maintain the information's secrecy, such as using passwords for its computers, limiting access among its employees, and entering confidentiality agreements.

UHS responds that the information is readily ascertainable from the internet and other public forums (for instance, in the reports that TBA is required to file with Medicare).  For example, TBA provided the identity of the physicians who either were employed or had privileges at its Fayetteville facility on its website, therefore preventing any claim that these identities are secret.  UHS has also produced a spreadsheet that purports to use only publically available data to recreate the documents and information it obtained through the confidentiality agreements.  UHS also argues that some of the information, specifically the negotiated rates with insurance companies, cannot be a trade secret because the insurance companies are under no contractual obligation to keep those rates secret.

The Court is far from convinced that TBA would ultimately be able to prove that the information it shared with UHS constituted trade secrets.  The affidavits and expert report TBA has provided do not contain the level of specificity that would allow the Court to conclude the information meets the requirements of § 4-75-601.  Rather, they generally refer to the sensitivity of the information without discussing with particularity which information is not readily ascertainable nor referencing specific parts of documents which contain valuable information.  Admittedly, however, there are cases that recognize that information similar to that disclosed by TBA qualifies

7

as a trade secret. *See*, *e.g.*, *Cardinal Freight Carriers, Inc. v. J.B. Hunt Transport Services, Inc.*, 336 Ark. 143, 150, 987 S.W. 2d 642, 645 (Ark. 1999). Therefore, applying the favorable view of TBA's evidence required by Fed. R. Civ. P. 56, the Court concludes that it cannot grant summary judgment on the basis that the information is not a trade secret.

Despite substantial doubts as to whether the confidential information qualifies as a trade secret, the Court will assume *arguendo* that it does for purposes of discussing misappropriation. The Act defines "misappropriation" as follows:

> (A) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> (i) Used improper means to acquire knowledge of the trade secret; or
>
> (ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>
> (a) Derived from or through a person who had utilized improper means to acquire it;
>
> (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .

Ark.Code Ann. § 4-75-601(2).

TBA contends that UHS's conduct meets the definition of misappropriation under both subsections of § 4-75-601(2). As stated *supra* in the discussion of TBA's deceptive trade practices claim, the Court finds no evidence supporting TBA's allegation that UHS entered the confidentiality agreements for the sole purpose of obtaining TBA's information. Absent some proof of UHS's nefarious intent in entering the confidentiality agreements, TBA cannot establish misappropriation

8

by improper means.  There was simply nothing improper about how the information was acquired:
TBA supplied it to UHS in order to facilitate UHS's potential purchase of TBA.  However,
subsection (B)(ii)(b) of the statutory definition is potentially more favorable to TBA.  At the time
of the alleged use, UHS knew that the information was acquired under circumstances giving rise to
a duty to maintain its secrecy or limit its use because UHS obtained the information pursuant to the
confidentiality agreements, which both require secrecy and limit use of the information.

Actual or threatened misappropriation of a trade secret may be enjoined under Arkansas law.
ARK. CODE ANN. § 4-75-604(a).  For the reasons stated *supra* in the discussion of TBA's contract
claim, the Court finds no evidence supporting a conclusion that UHS has used the information, and
thus no actual misappropriation.  However, Arkansas law does not require actual misappropriation.
An injunction may issue if there is evidence that an inevitable misappropriation will occur.  *See*
*Cardinal Freight Carriers*, 336 Ark. at 152, 987 S.W.2d at 646.  Because the misappropriation claim
can be sustained on the basis of the inevitability of future use or disclosure, the question becomes
what TBA must show in order to establish inevitability.

Initially, the Court notes that none of the cases applying the inevitable discovery doctrine fit
very well with the facts of this case.  The cases cited by the parties involve employees leaving one
company to work for another.  Neither party has provided the Court with a case extending the
doctrine to confidentiality agreements between companies involved in acquisition negotiations.  TBA
seems to suggest that inevitability of use can be shown simply through possession of potentially
useful information.  Examination of the employment cases applying the doctrine suggests that
something more is needed.  In *Cardinal Freight Carriers*, the Arkansas Supreme Court upheld an
injunction against an argument that the evidence of inevitability was too speculative.  336 Ark. at
152, 987 S.W.2d at 646.  As evidence supporting the injunction, the Court noted that the former

employees were serving the same clients for both employers, the competitor's president approved of telling customers how the competitor was better and comparing companies' plans and capabilities, and the competitor's employees stated an intent to exploit the holes in their former employer's software.   336 Ark. at 153, 987 S.W.2d at 647.   Conversely, in *Statco Wireless*, the Arkansas Court of Appeals found that an injunction to prevent misappropriation of trade secrets was not warranted. *Statco Wireless, L.L.C. v. Southwestern Bell Wireless, L.L.C.*, 80 Ark. App. 284, 95 S.W. 3d 13 (2003).   In reaching the decision, the court noted that an injunction could issue without actual use if use was inevitable, but found insufficient evidence to support a finding of inevitable misappropriation. 80 Ark. App. at 301, 95 S.W. 3d at 23.   Specifically, the court mentioned that the agent had given no indication it would disclose trade secrets and that disclosure of trade secrets was not inevitable because the agent could conduct its business without using the provider's confidential information.   *Id*.   Because these cases reached different results based on different amounts of evidence, they, at the least, establish that some evidence beyond possession of potentially useful information is needed to demonstrate inevitability.

Applying the lessons from these cases to the instant facts, the Court concludes that TBA has failed to provide evidence of inevitable disclosure.   Unlike the defendant in *Cardinal Freight Carriers*, UHS has never acknowledged any desire to use TBA's information for any purpose other than evaluating the potential purchase of TBA.   To the contrary, UHS has vigorously disputed any suggestion of improper use throughout this proceeding.   Furthermore, the undisputed testimony of Scott Williams indicates that it is possible for UHS to conduct its business without using TBA's information.   Williams was the CEO of UHS's Rivendell facility in Benton.   As CEO, Williams had full access to Rivendell's financial information and business strategy.   Williams left UHS for a position with TBA in which he supervises its CEOs and helps TBA compete with UHS.   Despite his

considerable knowledge of UHS's operations, Williams testified that he was confident he could preform his duties at TBA without using UHS's confidential information. This testimony supports an inference that, as in *Statco Wireless*, disclosure or use of trade secrets is not inevitable because UHS could conduct its business without using TBA's confidential information.

Lastly, the Court finds instructive a decision from Illinois, which has a trade secrets act that is almost identical to the Arkansas Trade Secrets Act. In a well-reasoned decision dismissing a misappropriation claim on a FED. R. CIV. P. 12(b)(6) motion, Judge Zagel wrote:

> Here there is no allegation that defendants have in fact threatened to use [the plaintiff's] secrets or that they will inevitably do so. An allegation that the defendants said they would use secrets or disavowed their confidentiality agreements would serve this purpose. An allegation that [the defendants] could not operate without [the plaintiff's] secrets because [the plaintiff's] secret technology is the only one that will work would suffice . . . . The defendants' claimed acts, working for [the plaintiff], knowing its business, leaving its business, hiring employees from [the plaintiff] and entering the same field (though in a market not yet serviced by [the plaintiff]) do not state a claim of threatened misappropriation. All that is alleged, at bottom, is that defendants could misuse plaintiff's secrets, and plaintiffs fear they will. This is not enough.

*Teradyne, Inc. v. Clear Communications Corp.*, 707 F.Supp. 353, 365-57 (N.D. Ill. 1989). Similarly, despite almost two years of discovery, TBA has provided no evidence suggesting that UHS said it would use TBA's information or that UHS could not operate without TBA's information. As in *Teradyne*, evidence showing nothing more than that the defendant could misuse the plaintiff's confidential information and that the plaintiff fears it will cannot support a finding of inevitability. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995).

In conclusion, even assuming (generously) that TBA can establish that the information constitutes trade secrets, summary judgment is appropriate on TBA's misappropriation claim because TBA has provided insufficient evidence of either actual or inevitable use.

### Count 2–"Breach of Contract"

To recover for breach of contract, TBA must prove: (1) the existence of a valid contract; (2) breach of the contract; and (3) damages that flow from the breach. *United States v. Basin Elec. Power Co-op*, 248 F.3d 781, 810 (8th Cir. 2001). Because the parties do not dispute the validity of either confidentiality agreement, the Court focuses on whether TBA has presented evidence of breach and damages. The confidentiality agreements state that the information provided will be used "solely for the purpose of allowing [UHS] to . . . determine whether [it] is willing to submit an offer to purchase the Assets." The agreements do not apply to public information, information obtained from a third party, or information already known to UHS. Therefore, to prove that UHS materially breached the contract, TBA must demonstrate that UHS used the information for some purpose other than determining whether to submit an offer and that it was the type of information covered by the confidentiality agreements. *See Sip-Top, Inc. v. Ekco Group, Inc.*, 86 F.3d 827, 830 (8th Cir. 1996). Furthermore, even if a breach were present, TBA must also demonstrate that any damages it sustained were caused by that breach. *See Basin Elec. Power Co-op.*, 248 F.3d at 815.

TBA has shown that UHS received various information from TBA regarding its business. TBA has also demonstrated that UHS eventually built and now operates a behavioral health center in Northwest Arkansas. Assuming that the information provided to UHS by TBA was confidential, the Court nonetheless concludes that TBA has not provided sufficient evidence to support its claim that UHS improperly used any confidential information when it built and organized its new health center. TBA has offered scant evidence, either direct or circumstantial, of how UHS improperly used confidential information. Rather, TBA asserts that the Court should infer that in deciding to build the new facility, UHS improperly used confidential information provided by TBA simply because it *could* have used the information and did in fact construct a new facility. "This type of

inference, however, is unreasonable and nothing more than mere speculation." *Sip-Top*, 86 F.3d at 831. At the summary judgment stage, TBA is entitled only "to those inferences which might be made without resorting to speculation." *Border State Bank, N.A. v. AgCountry Farm Credit Servs.*, 535 F.3d 779, 783 (8th Cir. 2008).

In *Sip-Top*, the Eight Circuit affirmed a grant of judgment as a matter of law on very similar facts. Sip-Top and Ekco, a competitor in the kitchen gadget business, entered discussions aimed at Ekco acquiring Sip-Top. 86 F.3d at 829. In order to protect confidential information provided to Ekco during the course of negotiations, Sip-Top required Ekco to sign a confidentiality agreement providing that Ekco would not use or divulge any confidential information provided by Ekco. *Id*. Sip-Top allowed Ekco representatives to tour its facilities and provided Ekco with design, production, and marketing information. *Id*. The acquisition ultimately fell through, and shortly thereafter, Ekco made an agreement with one of Sip-Top's major customers to provide a product similar to Sip-Top's but produced by a competitor. *Id*. Sip-Top sued, alleging many of the same misuse theories alleged by TBA, albeit under Minnesota rather than Arkansas law. *Id*. at 130. Just as in this case, Sip-Top sought to rely not on direct evidence, but rather on inference from the fact that the defendant had access to the information in a circumstance in which it could have been useful to misuse it. The district court concluded that Sip-Top's evidence was insufficient to survive a motion for judgment as a matter of law and the Eighth Circuit affirmed, writing:

> To accept Sip-Top's argument we would need to make the unreasonable inference that every time a company receives confidential information it uses that information if it negotiates with another entity. As recognized in [*Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1325 (5th Cir. 1994)], Sip-Top's position would lead to one of two equally unacceptable results: (i) every time a company entered into preliminary negotiations for a possible purchase of another company's assets in which the acquiring company was given limited access to the target's trade secrets, the acquiring party would effectively be precluded from evaluating other potential targets; or (ii) the acquiring company would, as a practical matter, be forced to make

> a purchase decision without the benefit of examination of the target company's most important assets–its trade secrets.

86 F.3d at 831.  The Court views TBA's efforts to invoke inference in this case as the equivalent of the impermissible inferences discussed in *Sip-Top* and declines to assume that UHS improperly used confidential information just because it had access to it.

None of the case law cited in TBA's opposition convinces the Court that the inferences TBA would have the Court draw are permissible.  TBA cites to numerous fraud cases for the proposition that circumstantial evidence can provide a basis for the jury to infer fraud where circumstances are inconsistent with honest intent.  *See, e.g.*, *Receivable Purchasing Co. v. Eng'g & Prof'l Servs*. 510 F.3d 840, 843-44 (8th Cir. 2008).  However, TBA has not alleged fraud in its Amended Complaint.  Likewise, TBA's citation to cases discussing the sufficiency of evidence supporting criminal verdicts misses the mark.  *See, e.g.*, *Payne v. State*, 21 Ark. App. 243, 731 S.W.2d 235 (1987).  To the degree TBA relies on these cases for the idea that a party can prevail on circumstantial evidence alone, the point does not particularly help TBA because the amount of evidence in these cases is far greater than what TBA has provided.  For example, in *Payne*, the State provided circumstantial evidence including the defendant's opportunity to commit the crime, the child's severe injuries, medical testimony confirming the injury was consistent with abuse, and the defendant's own implausible statement that the injuries occurred when the child fell off the porch.  731 S.W. 2d at 245-46.  Here, TBA has provided no circumstantial evidence aside from the opportunity to misuse the information (*i.e.*, possession by UHS), the potential usefulness of the information (*i.e.*, the expert testimony of David Wood), and the fact that UHS now operates a facility in Fayetteville.  As the *Payne* court noted, circumstantial evidence can be insufficient as a matter of law if it "leaves the jury solely to speculation and conjecture."  *Id*. at 247.

14

The Court is aware that TBA is somewhat handicapped by the fact that direct evidence of misuse would most likely come from the very parties accused of misusing the information. However, this fact did not prevent TBA from attempting to provide circumstantial evidence. For example, TBA could have presented evidence that UHS charges reimbursements that correspond to TBA pricing as reflected in the confidential materials. Correspondence between the confidential information and UHS practices might allow a reasonable factfinder to infer that UHS is in fact using the confidential information. Conversely, simply asserting that UHS could have used the material does not support a reasonable inference of improper use. *See Sip-Top*, 86 F.3d at 830-32.

The Court also finds significant that the confidentiality agreements do not prohibit UHS from constructing a rival facility in Northwest Arkansas. Indeed, the agreements do not even mention any potential curtailment of future competition between the parties. The Court finds that the 2004 and 2007 Agreements were designed to protect the confidentiality of TBA's information and prevent it from being used against TBA or disclosed to third parties. The Agreements were not designed to and did not protect TBA from future competition with UHS as there was no restriction against UHS's future business activities in Arkansas. *But see Cardinal Freight Carriers*, 336 Ark. at 152, 987 S.W.2d at 646 (allowing employee confidentiality agreement to support one year injunction on competition). In effect, TBA would have the Court read in an anti-competition clause that is not part of either agreement. Given the general disfavor with which such clauses are viewed, see *Duffner v. Alberty*, 19 Ark. App. 137, 139, 718 S.W.2d 111, 112 (1986), the Court hesitates to imply an anti-competitive effect into a contract that contains no express provision. Ultimately, if TBA's theory were accepted, it could be used to prohibit competition in any instance in which a seller and a buyer do not reach agreement on an acquisition after exchanging sensitive information.

In conclusion, without some means of support for its allegations that UHS has used the

15

confidential material for some purpose other than evaluating whether to purchase TBA, TBA's contract claim cannot survive the motion for summary judgment. *See Binkley*, 602 F.3d at 931; *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).[4]

Alternatively, even if the Court were to find that TBA has demonstrated a material breach of the confidentiality agreements, specifically, by showing that the information was either not certified as destroyed or returned as stipulated in the confidentiality agreements and/or that it was shared with Rob Minor, who was not part of the purchase discussions, TBA has failed to demonstrate the proper causal chain between any such breach and its claimed damages. TBA's theory is not that damages flowed from these minor breaches, but rather that these breaches are evidence that UHS misused the information, thereby damaging TBA. That is, the damages depend on the improper use of the information, not on whether or not the information was returned, destroyed, or inadvertently shared beyond the appropriate circle of UHS officials. As discussed, TBA has provided no evidence on misuse to take its allegations out of the realm of speculation. Therefore, even if the Court were to conclude that UHS breached the confidential agreements, TBA's claim fails because the alleged breach did not cause the alleged damage. *See Rhone-Poulenc*

---

[4] In its Amended Complaint, TBA specifically alleges breach of the duty of good faith. Am. Compl. at ¶ 49. UHS argues that breach of the duty of good faith is not actionable under Arkansas law. Although Arkansas no longer recognizes a tort for breach of the duty of good faith, see *Country Corner Food and Drug, Inc. v. First State Bank and Trust Co.*, 332 Ark. 645, 654-56, 966 S.W. 2d 894, 898-99 (1998), every contract nonetheless contains an implied covenant of good faith and fair dealing that creates actionable contractual obligations. *See All-Ways Logistics, Inc. v. USA Truck, Inc.*, 2007 WL 1965415, at *13 n.24 (E.D. Ark. Jul 02, 2007); *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 732-33 (8th Cir. 2003). The Court understands TBA's good faith claim to be based on allegations that UHS did not intend to make a purchase offer. For the reasons addressed in the discussion of TBA's deceptive trade practices claim, the Court finds no breach of the implied duty of good faith and fair dealing.

*Rorer Pharm., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996).[5]

### Count 3–"Interference with Contractual Relationships or Business Expectancies—Prospective Advantages; Violation of Deceptive Trade Practices Act"

Under Arkansas law, a claim for tortious interference with a contractual relationship has four essential elements: (1) the existence of a valid contractual relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference inducing or causing a breach of the relationship by the defendant; (4) damage to the party whose relationship has been disrupted. *See Vowell v. Fairfield Bay Cmty. Club, Inc.*, 346 Ark. 270, 58 S.W.3d 324, 329 (2001).[6]

In its Amended Complaint, TBA fails to specify the contracts or business expectancies with which it alleges that UHS has or is interfering. In its response to interrogatories, TBA stated that the interference claim involved four hospitals: Washington Regional Hospital, St. Mary's Hospital, Northwest Hospital, and Bates Hospital. TBA produced no contracts with any of these hospitals. After UHS filed its Renewed Motion for Summary Judgment, TBA amended its discovery responses to assert that UHS tortiously interfered with the contract of Dr. Stephen Dollins. Because TBA presses no argument concerning the hospitals, the Court assumes that TBA's interference claim is premised solely on Dr. Dollins's contract.[7]

---

[5] To the degree TBA relies on an unjust enrichment theory, either to support is argument for breach or as a means of establishing damages, the Court finds no basis for invoking the doctrine. *See Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665-66 (8th Cir. 2009).

[6] Arkansas previously required a specific showing of malice. *See, e.g., Elliott v. Elliott*, 252 Ark. 966, 482 S.W.2d 123, 128 (1972). Although the malice element has been relaxed, see, e.g., *Walt Bennett Ford v. Pulaski Cty. Spec. Sch. Dist.*, 274 Ark. 208, 624 S.W.2d 426, 429 (1981), there remains some heightened requirement of intentionality or improper behavior. *See City Nat. Bank of Fort Smith v. Unique Structures, Inc.*, 929 F.2d 1308, 1316 n.9 (8th Cir. 1991); *Vowell*, 346 Ark. at 277, 58 S.W. 3d at 329 ("We also require that the defendant's conduct be at least 'improper.'").

[7] In any event, the Court would grant summary judgment on a claim that UHS interfered with TBA's relationship with the hospitals because UHS has produced no evidence of interference.

The Court has difficulty understanding how it would be possible for UHS to cause Dr. Dollins to breach his contract when it seems that there was no breach at all. Dr. Dollins's contract required sixty days' notice for termination without cause. Provided that Dr. Dollins gave the requisite notice, and TBA has not averred that he failed to do so, he did not breach the contract when he left to work for UHS because the contract was no longer in effect. Accordingly, summary judgment is appropriate on TBA's interference claim. *See Receivables Purchasing Co., Inc. v. Engineering and Professional Services, Inc.*, 510 F.3d 840, 841-42 (8th Cir. 2008).

TBA also alleges that UHS violated the Arkansas Deceptive Trade Practices Act (the "ADTPA"). *See* ARK. CODE ANN. § 4-88-107. The ADTPA makes it unlawful to engage in "any . . . unconscionable, false, or deceptive act or practice in business, commerce, or trade," ARK.CODE ANN. § 4-88-107(a)(10), and it grants a private cause of action to "[a]ny person who suffers actual damage or injury as a result of an offense or violation as defined in this chapter," *id*. § 4-88-113(f).

TBA contends that UHS acted deceptively because UHS never intended to make a purchase offer and only entered the confidentiality agreements in order to gain a competitive advantage from having TBA's information. In support of the allegation, TBA points out that UHS never made an offer despite having the information it required. Additionally, TBA highlights that UHS produced virtually no internal documents referring to discussions about purchasing TBA. TBA argues it is implausible that a large corporation such as UHS would have no calendar entries, meeting notes, or internal analysis about a multimillion dollar purchase. Also, TBA contends that UHS's breach of an alleged oral standstill agreement to halt construction of its new facility during negotiations further indicates that UHS had no intention of purchasing TBA. UHS responds that it had every intention of making an offer and would have done so but for TBA withdrawing from the negotiations.

Although they do not reference certain calls made between the various corporate

18

representatives,[8] emails sent in March and April of 2007 provide a rough time line of the failed purchase talks.  Because UHS was in the midst of beginning construction on a new facility, the discussions were purposefully streamlined.  According to TBA, Debbie Osteen orally agreed to suspend construction during the discussions.  Beginning in early March, the parties exchanged several emails, noting which documents were required and providing the required information.  Kyle Naples believed he had provided all of the necessary documentation and called for a status update around March 20th.  During the call, he requested that UHS's offer take account of TBA's plans for a twenty-four to twenty-six bed expansion in the near future.  Larry Harrod explained that UHS would need additional information showing the projected cost of the expansion as well as the projected revenue for the new beds in order to include consideration of the expansion in UHS's offer price.  TBA provided the additional materials around March 23rd, with the understanding that an offer would be made on the following Friday, March 30th.  When an offer was not received on the 30th, Kyle Naples sent an email to Larry Harrod and Debbie Osteen, providing in pertenint part: "We are disappointed that Universal Health Services did not submit a purchase offer this week, as we were led to believe that it would.  It has been agreed upon by our Board to re-focus on the business at hand and not pursue a possible sale to your company."[9]  The following Monday, Debbie Osteen

---

[8] For example, in his deposition, Kyle Naples referenced phone conversations for which there are no documentary records.

[9] Although it was not mentioned in Kyle Naples's email to UHS, he testified in his deposition that the decision to end discussions was also based on rumors he had heard that UHS was continuing to move forward with construction of the new hospital.  Specifically, he mentioned he had been told that a landscape architect was "working on a bid or a project or something to do with the new hospital."  Naples took no follow-up action to confirm this report.  Kyle Naples also mentioned a phone call from Barry Pipken in which Pipken stated that he was never told to stop work on construction.  This conversation, however, took place after the March 30th email was sent. Therefore, although it might be post-hoc evidence to support the rumors, it did not affect Naples's decision to send the email ending discussions.  In any event, the Court finds the evidence of the

responded by email to Kyle Naples:

> I must say I am confused by your email.  At your request we have worked over the past few weeks to analyze your financials and put together an offer for purchase. Larry Harrod had requested a pro forma for the new beds you planned to add in the fall.  This was an important component of our offer.  He completed this analysis on Friday, 3/30/07.
>
> Larry indicated he talked with you on Friday about setting up a phone call on Monday to discuss this offer.  You indicated to Larry you would give him the best possible times for our discussion.
>
> We have looked back over our emails and I don't know why you had the impression we had a deadline of last week for this offer.  Even if you decide not to sell, it would make sense to at least receive our offer.
>
> We take pride in our reputation for being trustworthy.  It seems from your email there was a miscommunication.  I am on vacation this week and had planned to be on the call while on vacation.  If you would like to discuss this further, you can call my cell phone at ###-###-###.

Neither Kyle Naples nor anyone else from TBA responded to Osteen's email.

The undisputed facts of this case do not support a finding that UHS's conduct was unconscionable, false, or deceptive.  If anything, the back and forth between the parties establishes that TBA bears the fault for the breakdown of negotiations in 2007.[10]  There is simply no evidence to support a conclusion that UHS's conduct "affront[s] the sense of justice, decency, or

---

alleged breach of the alleged standstill agreement insufficient as a matter of law to support TBA's ADTPA claim.  *See Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 480 (8th Cir. 2004).

[10] To the degree that TBA relies on the 2004-2005 negotiations to establish its ADTPA claim, the Court finds they provide little support.  Aside from undisputed email evidence suggesting that TBA was responsible for the break down of negotiations in 2004-2005, TBA's eagerness to rekindle the negotiations in 2007 belies a finding of deceptive practices in 2004-2005.  It is simply implausible that TBA would reengage negotiations if it believed UHS was acting deceptively during the earlier negotiations.  Indeed, Kyle Naples March 2, 2007 email to Barry Pipkin confirms relations were amicable then.  Moreover, any claims that TBA was unaware of UHS alleged deceptive intent to use TBA's information to construct a hospital ring hollow because TBA was well aware that UHS had purchased land on which to construct a facility before the parties reentered negations in 2007.

reasonableness." *Baptist Health v. Murphy*, 365 Ark. 115, 128 (Ark. 2008).  Accordingly, summary judgment for UHS is appropriate on the ADTPA claim.

<u>**CONCLUSION**</u>

Upon consideration, the Court finds that the Renewed Motion for Summary Judgment should be and hereby is **GRANTED**.  TBA's claims against UHS are hereby **DISMISSED WITH PREJUDICE**.  All outstanding motions are **DENIED** as moot.

IT IS SO ORDERED, this 26th day of October, 2010.

        /s/ Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge